UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

POWERSCREEN USA, LLC, et al.                                    PLAINTIFFS

v.                                             CIVIL ACTION NO. 3:07CV-433-S

D & L EQUIPMENT, INC.                                           DEFENDANT

POWERSCREEN USA, LLC, et al.                                    PLAINTIFFS

v.                                             CIVIL ACTION NO. 3:07CV-699-S

S & L EQUIPMENT, INC.                                          DEFENDANT

## **MEMORANDUM OPINION**

This matter involves two related actions[1] brought by Powerscreen USA, LLC ("Powerscreen") and Terex Corporation, the successor to BL-Pegson USA, Inc. ("Terex"). Powerscreen is a Kentucky limited liability company that distributes large scale crushing and screening equipment and parts in the United States through a distributorship network. '433, DN 1, Complaint (Compl.), ¶ 5. Terex is a Delaware corporation with its principal place of business in Connecticut which also distributes crushing and screening products. '434,[2] DN 1, Compl., ¶ 3. Terex acquired Powerscreen in 1999.[3] BL-Pegson USA, Inc. was merged into Terex in 2006. Terex uses BL-Pegson as a trade name for equipment. '434. DN 1, Compl. ¶¶ 5, 8, 9. The actions arose

---

[1]To the extent that reference is made to filings in one or the other action, the court will refer to Civil Action No. 3:07CV-433-S and Civil Action No. 3:07CV-699-S as " '433" and " '699," respectively.

[2]This reference is to *Terex Corp. v. D & L Equipment, Inc.*, Civil Action No. 3:07CV-434-S where the complaint filed by Terex can be found. This action was consolidated into the lead action, '433, in 2008.

[3]Powerscreen and Terex have asserted claims in unanimity except to the extent that they seek reimbursement for purchases made from one or the other entity. The companies will be referred to herein collectively as "Powerscreen," unless identification of the particular entity from whom the equipment or parts were purchased is required.

from the deterioration of a long-standing business relationship between Powerscreen and two distributors, D & L Equipment, Inc. and S & L Equipment, Inc.  Powerscreen seeks to recover on allegedly unpaid invoices for equipment and parts.  The distributors have counterclaimed alleging various wrongs by Powerscreen, including, among others, breaches of warranty, and interference with their contracts and prospective business relationships.

## I.

We are faced, at this juncture, with numerous motions for partial summary judgment by Powerscreen seeking to pare down the case claim-by-claim and ultimately resolve the actions in its favor.  We will address the motions *seriatim*.  We note generally at the outset, however, that the underlying facts are not altogether clear with respect to some of the motions.  This is due, in part, to an apparent lack of business rigor in managing the affairs of the two distributorships.  The parties agree that some S & L business was "run through" D & L.  Additionally, there is a marked lack of paperwork to support much of what the distributors claim.  To the extent that various claims of the distributors stand wholly unsupported, summary judgment will be granted in favor of Powerscreen on these matters.  To the extent that the evidence has not been sufficiently developed or issues clearly elucidated by Powerscreen to establish entitlement to summary judgment, Powerscreen's motions will be denied.

## II.  Background of the Disputes

Powerscreen Michigan distributed Powerscreen equipment and parts in Michigan from 1991 to 1994.  It sold its distributorship rights to D & L Equipment, Inc. ("D & L"), a Michigan corporation formed in 1994 which is owned by Michael David Conlon ("Conlon").  Conlon testified that though Powerscreen Michigan operated under a written agreement, D & L did not execute its own distributorship agreement with Powerscreen or Terex, as the documents seemed to him to be

"hugely one-sided." Conlon Oct. 1, 2008 depo., p. 38. D & L also became an authorized distributor of BL-Pegson products in Michigan.[4]  In 2005, D & L obtained Ohio distributorships for Powerscreen and Terex equipment and parts. Powerscreen and Terex allege that they sold, delivered to, and invoiced D & L for equipment and parts for which D & L has not paid. They seek to recover on unpaid invoices for those products and on a promissory note to Powerscreen.

S & L Equipment, Inc. ("S & L") is an Arizona limited liability company which began distributing Powerscreen and Terex equipment and parts in 2003. S & L is also owned by Conlon, and was ostensibly managed by Conlon's brother, Steve Conlon. Steve Conlon signed a distributorship agreement with Terex on behalf of S & L in 2004.[5]

D & L and S & L incurred substantial outstanding obligations on their respective accounts with Powerscreen. In 2006, Powerscreen became concerned over the amounts owed, and required them to pay down the balances. They were paid down in large part over the following eighteen months. Powerscreen required that the remaining sums be paid under a written payment plan, to which the defendants agreed. Powerscreen claims that it terminated the Ohio, Michigan, and Arizona distributorships after the defendants defaulted on payments under the plan. Powerscreen sent notice of termination in May 2007 to D & L and in September 2007 to S & L.

The defendants contend that they were essentially put out of business by Powerscreen. They urge that after Powerscreen acquired struggling competitor Finlay Hydrascreens in 1995, its new line of Finlay products competed with their Powerscreen business in their exclusive markets. The distributors contend that Powerscreen took advantage of their work in developing the markets and new product concepts. They claim that Powerscreen forced them out by imposing unreasonably

---

[4]Powerscreen Michigan was not a distributor of BL-Pegson products.

[5]A written distributorship contract was signed by Steve Conlon, brother of Michael David Conlon, on behalf of S & L. Michael David Conlon disputes his brother's authority to enter into the agreement and posits that S & L had no written distributorship agreement governing its relationship with Powerscreen..

high prices and impossible credit terms.  They further contend that Conlon's active participation in the North American Dealers Association and his vocal opposition regard to pricing and marketing matters was not well received by Powerscreen and fueled its desire to eliminate D & L and S & L as distributors.

### III.  Summary Judgment

A party moving for summary judgment has the burden of showing that there are no genuine issues of fact and that the movant is entitled to summary judgment as a matter of law.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 151-60, 90 S. Ct. 1598, 16 L. Ed. 2d 142 (1970); *Felix v. Young*, 536 F.2d 1126, 1134 (6th Cir. 1976).  Not every factual dispute between the parties will prevent summary judgment.  The disputed facts must be material.  They must be facts which, under the substantive law governing the issue, might affect the outcome of the suit.  *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2510 (1986).  The dispute must also be genuine.  The facts must be such that if they were proven at trial, a reasonable jury could return a verdict for the non-moving party.  *Id.* at 2510.  The disputed issue does not have to be resolved conclusively in favor of the non-moving party, but that party is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial.  *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288-89 (1968).  The evidence must be construed in a light most favorable to the party opposing the motion.  *Bohn Aluminum & Brass Corp. v. Storm King Corp.*, 303 F.2d 425 (6th Cir. 1962).

IV.  Evidentiary Motions

Powerscreen has made a number of motions to strike various items of evidence offered by one or both defendants in opposition to certain summary judgment motions.

A.  Plaintiffs' Motion to Strike and Disregard Evidence
Relied upon in Defendant's Response Briefs,
Docket Numbers 82, 84, 109, 118, 119 ('433, DN 130)

and

Cross-Motion to Supplement Docket Numbers 82, 84, 109, 118, and 119
('433, DN 140)

Powerscreen asks the court to strike the affidavits of Margaret Clemons, Scott Gibbs, and George Moffatt, on the ground that these individuals confirmed in deposition that they did not have knowledge of the matters related in their affidavits, and in some instances acknowledged that statements were factually incorrect.

The affiants were employees of D & L.  Clemmons was the office manager from 1994 to the present, George Moffatt was the parts manager from 2004 to 2005, and Scott Gibbs was the parts manager from 2005 to the present.  D & L appears to concede the inadequacy of these affidavits, as it states that they were either "clarified in or retracted by" the later depositions.  In conjunction with the response, D & L seeks to supplement its responsive briefs with additional deposition testimony of Conlon.

Powerscreen's motion to strike the affidavits will be granted, and D & L will be permitted to supplement its briefs.  Powerscreen urges that Conlon's testimony concerns the parts processing procedures for S & L rather than D & L.  This objection goes to the weight to be given this material, however, with respect to each motion for which it is offered.  This deposition of Conlon has been referenced by the parties throughout their motion practice.  We find no prejudice in the late addition of these citations.

Powerscreen's motion to strike ('433, DN 130) will be granted and D & L's motion to supplement ('433, DN 140) will be granted by separate order.

### B.  Plaintiffs' Motion to Strike and Disregard Evidence
### Relied Upon in Defendant's Responsive Briefs,
### Document Numbers 107, 109, 110, 118, and 119 ('433, DN 129)

Powerscreen asks the court to strike "Exhibit A" from the responsive briefs of D & L.  This exhibit purports to be a 1991 distributorship contract between Powerscreen of America, Inc. and Powerscreen Michigan.  It is signed on behalf of Powerscreen Michigan by Scott Newell, as President, who has submitted an affidavit in response to the motion to strike.  Newell stated in his affidavit that he assigned his rights and obligations under the distributorship agreement to D & L.  Newell Aff., ¶ 11.  He stated that he is aware that Powerscreen of America became known in the industry as Powerscreen USA.  Newell Aff., ¶ 12.

The contract is incomplete, as it is missing page 6.  Powerscreen urges that the defendants have not established that Powerscreen of America, Inc. is now Powerscreen USA, LLC, or that the Powerscreen Michigan contract has any bearing on D & L's distributorship rights in Michigan.  Powerscreen refers to Conlon's testimony that he would not sign a written agreement with Powerscreen.

Newell's bare statements concerning the assignment of rights and identity of Powerscreen are insufficient.

First, Newell's statement that Powerscreen of America "became known" in the industry as Powerscreen USA establishes nothing about the relationship, if any, between the two entities.  While it might provide some clue that, indeed, these two entities are one-and-the-same, Newell offers nothing more than an unembellished, somewhat vague statement that he is "aware" of what "became known" in the industry.  D & L's offer of a collateral reference in the caption to a court document

in another case does little to further its contention.  We note, however, that Powerscreen has not directly denied that it was formerly known as Powerscreen of America.[6]

We conclude that D & L has failed to establish that "Exhibit A" has any relevance to the issues in either of the actions before us, and therefore will be stricken from the responsive pleadings.

Initially, we note that to date D & L has not produced a complete copy of the agreement. More troubling is that D & L has produced no evidence concerning the transaction between Newell and Conlon in purchasing the distributorship rights beyond the fact that Newell claims to have assigned all rights and obligations under the written agreement to D & L.  Conlon states that he paid $300,000.00 for the distributorship.  D & L seeks to find enforceable rights under Powerscreen Michigan's written agreement.  A review of the portion of the document that has been produced reveals that assignment of the agreement is not permitted without the prior written consent of Powerscreen.  April 4, 1991 Distributorship Agreement, § 18(c).  As D & L has offered no evidence concerning the assignment, no evidence of the prior written consent of Powerscreen of America has been produced, and Conlon has denied signing any distributorship document himself, we conclude that "Exhibit A" has not been shown to be relevant to any matters in these actions.

Powerscreen's motion to strike ('433, DN 129) will be granted by separate order.

---

[6]This is but one example of the lack of clarity in the underlying facts in this action.  D & L acquired the distributorship from Powerscreen Michigan.  Powerscreen Michigan operated under a written distributorship agreement which certainly *appears* likely to have been with an entity which is now Powerscreen USA, LLC.  To the extent that Powerscreen muddies the waters by challenging the proof, but not denying that Powerscreen of America is, in fact, Powerscreen USA, its obfuscation serves no valid purpose  discernable by this court.

C.  Plaintiffs' Motion to Strike and Disregard Evidence
Relied upon in Defendant's Response to Plaintiffs'
Motions for Summary Judgment on Defendant's Counterclaims,
Document Number 80 ('699, DN 93)

S & L filed a consolidated response to various Powerscreen motions, DNs 68, 69, 70, 71, 72, and 75 in the '699 action.  Powerscreen has moved to strike various exhibits and references to testimony in S & L's brief.

We need not belabor the individual objections lodged by Powerscreen inasmuch as S & L's response satisfies most of Powerscreen's concerns.  S & L did not provide references to the deposition of Conlon, as it had not been transcribed at that time.  Its response to the motion to strike[7] contains the necessary references and provides a foundation for the various documents offered in its responsive briefs.  Powerscreen objects to S & L's tendered documents on the ground that they do not support the propositions for which they are offered.  The motion to strike will be denied, however, as Powerscreen's argument goes to the weight to be given the documents.

Powerscreen's motion to strike ('699, DN 95) will be denied by separate order.

V.  Summary Judgment Motions - Powerscreen and Terex Claims

A.  Plaintiff, Powerscreen USA, LLC's Motion for
Partial Summary Judgment on its First Cause of Action ('433, DN 75)

and

Plaintiff, Powerscreen USA, LLC's Motion for
Partial Summary Judgment on its First Cause of Action ('699, DN 73)

Neither D & L nor S & L deny that the invoices[8] produced by Powerscreen in support of their motion for judgment on the outstanding principal balances on their respective accounts have not

---

[7]Defendant's Amended Memorandum in Response and Opposition to Plaintiffs' Motion to Strike ('699, DN 95).

[8]Powerscreen has submitted a summary of invoices rather than the invoices themselves due to the volume of paper which would be involved.  It has maintained the actual invoices and they are available for review.

been paid. Powerscreen has come forward with evidence concerning orders which were filled, shipped, received and invoiced. Significantly, Powerscreen has established that its products were not returned or otherwise rejected by the defendants.

In response, both D & L and S & L suggest that there were numerous irregularities in orders from Powerscreen, and often non-conforming goods were received about which the companies complained. They contend that their receipt of the products does not equate with acceptance of non-conforming goods. Additionally, in a number of instances, the defendants are unable to state that they, in fact, received the shipments in question. The defendants further urge that items would arrive damaged or that items would be missing from the orders.

Unfortunately, these general contentions are completely undocumented. The defendants have provided no record of any calls, e-mails, or letters concerning missing or damaged shipments, or the refusal to accept any shipments of goods, with the exception of one machine which was claimed to have arrived broken in half. In any event, as the defendants acknowledge that products were not returned to Powerscreen, they do not state any justification for failing to pay the amounts owed.[9] The court concludes that there is no genuine issue of material fact with respect to the claims for recovery of the sums due on Powerscreen's unpaid invoices, and that Powerscreen is entitled to summary judgment as a matter of law. Under the Uniform Commercial Code as adopted in Kentucky, the acceptance of goods occurs when the buyer does an act inconsistent with the seller's ownership. KRS 355.2-606(1)(c). Upon acceptance, the defendants were obligated to pay Powerscreen. KRS 355.2-507(1). Retaining goods without rejecting them or revoking acceptance constitutes acceptance under the UCC. *See, The Marley Cooling Tower Co. v. Caldwell Energy & Environmental, Inc.*, 280 F.Supp.2d 651 (W.D.Ky. 2003).

---

[9]The issue of setoff is discussed in connection with the claims for breach of warranty.

The defendants urge that costs incurred in repairing damaged items should be credited as a setoff to the invoice amounts.  To the extent that any of these repairs are documented, they are warranty claims which are addressed later in this opinion.  The existence of any sum in setoff does not preclude recovery in principle on the claims for these unpaid invoices.

The motion for judgment against D & L in the sum of $536,937.59, the outstanding principal balance on unpaid invoices for parts ('433, DN 75), and the motion for judgment against S & L in the sum of $191,482.89, the outstanding principal balance on unpaid invoices for parts ('699, DN 73), will be granted by separate non-final order.

B.  Plaintiff, Terex Corporation, as Successor to
BL-Pegson USA, Inc.'s Motion for Partial Summary Judgment
on its First Cause of Action ('433, DN 77)

and

Plaintiff, Terex Corporation, as Successor to
BL-Pegson USA, Inc.'s Motion for Partial Summary Judgment
on its First Cause of Action ('699, DN 74)

These motions by Terex are virtually identical to Powerscreen's motions for judgment on its unpaid invoices.  The defendants contend the same pattern of irregularities and delivery of non-conforming goods, but lack documentation to support these contentions.  The defendants have shown, through a letter from Terex, that a machine arrived with an oil leak and that the machine was repaired, was used, and was not returned.  Again, this is in the nature of setoff, rather than a defense to the claim for payment of the outstanding invoices.  As with the contract claims by Powerscreen, the defendants do not deny that the invoices in question remain unpaid.[10]  Terex has come forward with evidence that the orders were filled, shipped, received and invoiced.  Terex has established that the products were not returned or otherwise rejected by the defendants.  We find that no genuine

---

[10]Terex has submitted a summary of invoices rather than the invoices themselves due to the volume of paper which would be involved.  It has maintained the actual invoices and they are available for review.

issue of material fact exists with respect to Terex's claims for recovery of the sums due on its unpaid invoices.  The goods were accepted and D & L and S & L respectively were obligated to pay Terex therefore.  KRS 355.2-606(1)(c); 355.2-507(1); *Marley Cooling Tower, supra.*

The motion for judgment against D & L in the sum of $737,795.49, the outstanding principal balance on unpaid invoices for parts and equipment ('433, DN 77), and the motion for judgment against S & L in the sum of $451,243.83, the outstanding principal balance on unpaid invoices for parts ('699, DN 73), will be granted by separate non-final order.

C.  Plaintiff, Powerscreen USA, LLC's Motion for
Partial Summary Judgment on its Second Cause of Action ('433, DN 87)

Powerscreen has moved for judgment on a $65,000.00 promissory note executed by Conlon on behalf of D & L on June 23, 2004.  Powerscreen has established that an unpaid principal balance of $50,000.00 remains due on the note.[11]  D & L admits that it entered into the note.  Response to Request for Admission No. 1.

D & L has not responded to this motion for summary judgment.

The court finds that no genuine issue of material fact exists with respect to Powerscreen's claim for judgment on the $50,000.00 unpaid principal balance on the promissory note, and that Powerscreen is entitled to judgment as a matter of law.

The motion for judgment against D & L in the sum of $50,000.00, the outstanding principal balance on the June 23, 2004 promissory note, and for pre- and post-judgment interest ('433, DN 87) will be granted by separate order.

---

[11] Powerscreen afforded D & L a $15,000.00 credit on the principal amount.

VI.  Summary Judgment Motions - D & L and S & L's Counterclaims

A.  Plaintiffs' Motion for Partial Summary Judgment on
Counts I and II of Defendant's Counterclaim ('433, DN 97)

and

Plaintiffs' Motion for Partial Summary Judgment on
Defendant's Counterclaims for Breach of Contract and
Breach of Implied Covenant of Good Faith and Fair Dealing
– Counts I and II ('699, DN 71)

The defendants allege that Powerscreen breached their oral distributorship agreements.[12] They also allege violation of an implied duty of good faith and fair dealing running with those oral agreements.  In order to recover on a claim for breach of a contractually imposed duty, the defendants must show the existence of a valid contract, a breach of the contract, and damages. *Sudamax Industria E Comercio de Cigarros, LTDA v. Buttes & Ashes, Inc.*, 516 F.Supp.2d 841 (W D Ky. 2007).

It is undisputed that D & L and S & L had incurred approximately $7.2 million on open accounts to Powerscreen by June 2006 for operations in Michigan, Ohio, and Arizona.  At that time, Powerscreen notified D & L that $4.2 million of that amount was past due.[13]  While it was not uncommon for dealers to carry several million dollars on open account, Powerscreen required that D & L reduce the past due amount.  By February, 2007 the defendants had reduced the past due amount to $1.78 million.  Powerscreen then required that the distributors enter into a written payment plan to resolve the remaining past due balances.

_____

[12]As noted earlier, Steve Conlon signed a written distributorship agreement on behalf of S & L, but Michael David Conlon disputes the validity of that agreement.  For purposes of this motion, we will take the allegations in the light most favorable to S & L and find that its relationship with Powerscreen was governed by an oral agreement.

[13]Both D & L and S & L have counterclaimed against Powerscreen. While these companies physically conducted business as separate entities in different states, it appears undisputed that "[m]ost everything was run through D & L's account." Oct. 28, 2008 Jeffrey Todd Goss depo., p. 226.  Thus the communications concerning payments are directed primarily to D & L, but apply equally to default by both entities and the eventual termination of the distributorships of both companies.

With respect to D & L, it made payments on February 24 and March 24, 2007, but made no further payments.   Rob Haydon Aff., ¶ 2.   D & L was notified of the termination of its distributorships in May of 2007.

With respect to S & L, it appears that payments were made under the payment plan in March, April, May and June, but no further payments were made after that time.   It was notified in September of 2007 of the termination of its Arizona distributorship.

The defendants urge that Powerscreen breached its agreements with them by terminating them without good cause, and breached their right to exclusivity in their respective markets by permitting the sale of Finlay equipment and parts, a competing line of products.

First, the defendants have adduced no evidence to support the contention that the oral agreements mandated termination of the distributorships only for good cause.  Even so, Powerscreen clearly had good cause for termination, as the defendants defaulted on the terms of their respective payment plans.

Second, we find the allegation of breach of the term of exclusivity to be without merit.  After the acquisition of Finlay, Powerscreen sought to develop the market for Finlay products.  The sale of such products cannot be found to impinge upon the defendants' rights to sell Powerscreen and Terex products.   The products in competition with Powerscreen were Finlay products.

The defendants do not state claims for breach of an implied duty of good faith and fair dealing which are distinguishable from their contract claims.  The testimony of Conlon establishes that the claims are essentially that Powerscreen breached its agreements with the defendants and did so in bad faith.  The conduct and resulting damages alleged by the defendants are not distinguished as between the claims.  Conlon did not identify any damages beyond the alleged $2,000,000.00 in lost value of the going concerns.  We have found that Powerscreen terminated the agreements on grounds which constituted good cause, and that there was no breach of the defendants' rights of exclusivity.  As the terminations and the Finlay product sales are the only acts alleged to have been

engaged in in bad faith, the defendants' claims for breach of the implied covenant of good faith and fair dealing must fail.

The court concludes that no genuine issue of material fact exists as to the counterclaims of the defendants for breach of contract and breach of the covenant of good faith and fair deal, and that Powerscreen is entitled to judgment as a matter of law.

The counterclaim denominated I and II in each action will be dismissed by separate order.

B.  Plaintiffs' Motion for Partial Summary Judgment on
Defendant's Unjust Enrichment Claim for Relief ('433, DN 93)

and

Plaintiffs' Motion for Partial Summary Judgment on
Defendant's Counterclaim for Unjust Enrichment - Count VI ('699, DN 72)

In this counterclaim, the defendants postulate that Powerscreen was unjustly enriched by their expenditures of effort and knowhow in developing the markets from which they were ousted. The defendants state specifically that "the unjust enrichment claim[s] stem[] from conduct not found within the contracts..." '433, DN 108, D & L's Response, p. 1.  The problem with this argument is that best efforts to promote the sale of Powerscreen's products is what is required of a seller in the conduct of his business, under the UCC.[14]  KRS 355.2-306(2); Mich. Comp. Laws  440.2306(2); Ohio Rev. Code. 1302.19(B).  *See also,* 2 E. Allan Farnsworth, Farnsworth on Contracts, 383-84 (2d Ed. 1998)(Best efforts "has diligence as its essence").  The defendants have not identified any conduct which was beyond their best efforts to promote the sale of Powerscreen products.  To that end, the parties received what they bargained for and no more.

---

[14]To the extent it is viable, the written contract between Powerscreen and S & L required S & L's best efforts.

The court finds that no genuine issue of material fact exists with respect to the counterclaims of the defendants for unjust enrichment, and that Powerscreen is entitled to judgment as a matter of law.

The counterclaims denominated VI in each action will be dismissed by separate order.

C.  Plaintiffs' Motion for Partial Summary Judgment on
Defendant's Counterclaim for Breach of Fiduciary Duty ('433, DN 83)

and

Plaintiffs' Motion for Partial Summary Judgment on
Defendant's Counterclaim for Breach of Fiduciary Duty ('699, DN 69)

The defendants have alleged breach of fiduciary duty by Powerscreen.  They contend that because Powerscreen identified sales goals and business development plans for its distributors, it had a fiduciary duty in its relationship with them.  They further urge that a fiduciary duty arose when distributors brought product ideas and marketing plans to Powerscreen, and when Powerscreen sought information about their sales and customers.

A fiduciary duty is "founded on trust or confidence reposed by one person in the integrity and fidelity of another and which necessarily involves an undertaking in which a duty is created in one person to act primarily for another's benefit in matters connected with such undertaking." *Steelvest, Inc. v. Scansteel Service Center, Inc.*, 807 S.W.2d 476, 485 (Ky. 1991).  "Absent a confidential relationship between the parties, a contractual agreement between a buyer and a seller does not create a fiduciary relationship. *Anchor v. O'Toole*, 94 F.3d 1014, 1024 (6th Cir. 1996).  The Sixth Circuit has rejected arguments that the specialized knowledge possessed by a seller creates fiduciary obligations to buyers. *Greenberg v. Life Ins. Co. of Virginia*, 177 F.3d 507, 521-22 (6[th]

Cir. 1999)." *Sudamax.*, 2007 WL at *7; *see also, Vinson v. Ford Motor Credit Corp.*, 56 Fed.Appx. 220 (2003).

The parties operated under distributorship agreements where buyers and sellers acted in their own interests. No special relationship has been shown in this instance. The identification of sales goals and business development strategies has not been shown to create a relationship of special trust and confidence. Further, Conlon's testimony evidences that D & L and S & L were acting in their own interests in refusing to reveal sales and customer data to Powerscreen. In fact, Conlon suggested a *lack* of special trust and confidence, and he took an arms-length approach to the buyer-seller relationship. Conlon offered no concrete information concerning concepts brought to Powerscreen which would create a fiduciary obligation between the parties. Rather, Conlon spoke in general terms about the Dealer's Association's collective knowledge concerning the needs in the marketplace. He discussed the development of similar machinery in the Finlay line of products, but also acknowledged that there were a number of competing lines of machinery in the industry.

The court finds that no genuine issue of material fact exists concerning the counterclaims for breach of fiduciary duty, and that Powerscreen is entitled to judgment as a matter of law.

The counterclaims denominated Count IV in each action will be dismissed by separate order.

D.  Plaintiffs' Motion for Partial Summary Judgment on
Defendant's Unfair Trade Practices Claim for Relief ('433, DN 95)

and

Plaintiffs' Motion for Partial Summary Judgment on
Defendant's Counterclaim for Unfair Trade Practices - Count VIII ('699, DN 70)

The defendants have alleged that Powerscreen engaged in unfair competition.  They have not alleged antitrust violations in these actions, despite raising the specter of a Department of Justice investigation.[15]  Therefore, KRS 367.175 is inapplicable.

KRS 367.170 is inapplicable.  KRS 367.220 limits private rights of action under 367.170 to purchasers or lessors of goods or services primarily for personal, family, or household use.  *Hunt Enterprises, Inc. v. John Deere Industrial Equipment*, 18 F.Supp.2d 697 (W.D.Ky. 1997).  The Powerscreen products are large crushing and screening equipment used in large commercial operations.  The claims of the defendants are therefore not redressable under that statute.

Further, the defendants have not stated a viable claim for common law unfair competition as Powerscreen and D & L/S&L are seller and distributor, not competitors.  *Covington Inn Corporation v. White Horse Tavern, Inc.*, 445 S.W.2d 135, 138 (Ky. 1969).

The court finds that no genuine issue exists with respect to the claims for unfair trade practices and that Powerscreen is entitled to judgment as a matter of law.

The counterclaims denominated Count VII in both actions will be dismissed by separate order.

---

[15]The defendants' request for discovery in this matter was denied by the magistrate judge on the ground that the defendants have not alleged antitrust violations.  ('433, DN 89).

- 17 -

E.  Plaintiffs' Motion for Partial Summary Judgment on
Count VIII of Defendant's Counterclaim ('433, DN 94)

D & L has alleged violations of the Michigan Farm and Utility Equipment Act, Mich. Comp. Laws 445.1451, *et seq.* and the Ohio Equipment Dealer Agreements Act, Ohio Rev. Code 1353.001, *et seq.*

The Michigan Farm and Utility Equipment Act prohibits a supplier from terminating a distributorship agreement without good cause.  Mich. Comp. Laws 455.1457(a).  D & L readily admits that failure to perform a substantial part of the distributorship agreement or one of its essential terms constitutes a substantial breach under Michigan law.  *Rosenthal v. Triangle Dev, Co.*, 246 N.W. 182 (Mich. 1933).  The court has already determined that no genuine issue of material fact exists with regard to D & L's default under the repayment agreement.  Additionally, as the Michigan distributorship agreements were entered into in 1994, the 1995 amendment adding "good cause" with respect to terminations does not apply.  *See, Cloverdale Equipment Co. v. Manitowoc Eng. Co.,* 1998 WL 385906 (6th Cir. July 1, 1998)("good cause" requirement does not apply retroactively).

Both the Ohio and Michigan acts provide for notice and an opportunity to remedy default.  Ohio Rev. Code 1353.06(B); Mich. Comp. Laws 445.1457a(1).  There is no dispute that the notice requirements were timely met by Powerscreen, and that D & L failed to remedy its defaults.  Finding D & L's actions to be unsatisfactory, it terminated the distributorships.  There has been no evidence offered by D & L to contradict Powerscreen's assertion that it complied with the statutory requirements in terminating the D & L distributorships.

D & L attempts to craft a theory of noncompliance by focusing on the change in business practices with respect to D & L. D & L contends that it was squeezed by Powerscreen when it was required to reduce its past due indebtedness, enter into a payment plan, and remain current on new purchases, while Powerscreen simultaneously raised its prices and developed the market for Finlay products.  However, D & L has not shown that other distributors with $7.2 million in unpaid

invoices were treated differently from D & L or that the price increases were not handled evenhandedly in the market.[16]

The court finds that no genuine issue of material fact exists with respect to the claims for violation of the Michigan Farm Utility Equipment Act and the Ohio Equipment Dealer Agreements Act, and that Powerscreen is entitled to judgment as a matter of law.

The counterclaim denominated Count VIII in action '433 will be dismissed by separate order.

F.  Plaintiffs' Motion for Partial Summary Judgment on
Defendant's Counterclaims for Tortious Interference with Contract and
Tortious Interference with Prospective Business Relationship ('433, DN 96)

and

Plaintiffs' Motion for Partial Summary Judgment on
Defendant's Counterclaims for Tortious Interference with Contract and
Tortious Interference with Prospective Business Relationship -Count V ('699, DN 68)

The defendants contend that in advance of the terminations, Powerscreen disseminated information in the industry that the defendants would be losing their distributorships.  They contend that these rumors caused them to lose current and potential contracts with established customers due to fears that the defendants would be unable to fulfill their obligations to deliver products and provide warranty service.

Conlon testified that three customers with whom D & L had an established relationship, Evans Landscaping, Curtis Brothers, and J R. Jurgens, did not do further business with D & L after information about the terminations was circulated.  Conlon did not offer any specifics concerning

---

[16]An additional argument is made in response to the motion for judgment on this claim relating to the "Exhibit A" which was stricken from the pleadings.  "Exhibit A" purported to be a 1991 distributorship agreement between Powerscreen of America, Inc. and Powerscreen Michigan.  The argument of D & L is unclear with respect to this document and its claims for violation of the Michigan and Ohio acts.  However, this agreement was not referenced in D & L's answer or counterclaim.  Further, as previously determined, the document has not been shown to be relevant.

who disseminated the information to whom or when.  Powerscreen does not deny that it had contact with several distributors in Ohio about acquiring its lines.  Powerscreen asserts that it sent form letters which did not mention D & L or the future of D & L's distributorships.  D & L counters that in light of its exclusive distributorship, the letters created the proverbial "elephant in the room." Whether or not such wholly generic and indirect "information" provided to potential distributors can be viewed as an interference by Powerscreen with D & L's business with its customers is questionable, as the attenuated communication has broadly been claimed to have been disseminated "in the industry."  However, even if this communication was found to have sparked rumor,  the sole evidence offered to support the claim that D & L lost business as a result is the testimony of Douglas L. Evans.  This testimony does not establish Powerscreen's conduct as the cause.

Evans stated in his deposition that he could not be sure whether he had any contracts pending with D & L at the time he learned of the possible termination.  Evans depo. p. 14.   He testified that he was, in fact, in the market to buy a piece of machinery, but that he did not purchase it from D & L.  *Id.*, p. 11.  Evans stated that:

A:  [T]here were too many rumors out there about getting parts and about who was going to be the dealer and about this and that and I didn't want to take any chances. You know, I'm tired of getting these foreign machines that were built here in the U.S. and not being able to get parts and get them worked on, so we bought a U.S. machine.

Q: Where did you hear these rumors from?

A: Just–all the Irish salesmen that come in here, they're all crushing and screening people and, I mean, there's a lot of them and they all talk.  And even if you don't care about what the competitor does or whatever, they all talk and they're always saying, well, so and so has a dealership or so and so doesn't or–and it's just like, well, I don't need to know who has a dealership.  I just need to be able to get parts.

Q: Did anyone from Powerscreen or Pegson ever tell you that Mr. Conlon or D & L was not going to be a Powerscreen dealer?

A: Well, I mean, there's all sorts of people in here that say they might have worked for Pegson or they might have worked for a Powerscreen dealer or worked for–you know, to me they're just all Irish guys selling equipment and I don't know who they all were, but yeah, they were in here saying D & L was no longer the dealer...

Evans depo., pp. 11-12.  Evans continued to dissemble about the communications from "Irish salesmen," and repeated that he just wanted to be able to get his parts:

> A: There were a lot of people in here.  I can't tell a direct person, you know, if it was Joe Blow or Bill Smith or whoever, but there was enough rumors that it had me concerned because I heard it from more than one or two people.
>
> Q: But you don't know if one–if those people were from Powerscreen or Pegson?
>
> A: Well, a couple of the people might have worked for them before or–you know, they all switch jobs.  Just because they're with Powerscreen today, they're with somebody else tomorrow.  They might be with Powerscreen, whatever–I mean, you know, Finley, Powerscreen, all the different ones, they all–you know, one time they'll be in here with one card and it will be the same guys back with a different card...
>
> Believe me, there's always another Irish guy telling you not to buy somebody's equipment and buy theirs.  It happens all the time...
>
> Q: Okay.  Did you ever contact D & L regarding its continuation as a Powerscreen or Pegson distributor?
>
> A: Oh, when that Ken was in here, you know, when my guys would, whatever, say, hey, what's going on, you know, and sometimes they had the dealership and then maybe they didn't have the dealership.  You couldn't believe anything any of the Irish guys tell you, if you want to know the truth...
>
> We just wanted to be able to get our parts.

Evans depo., pp. 13, 18, 21.

The only conclusive statement from this testimony is that Evans was tired of not being able to get parts for foreign machines and so he bought a "U.S. machine."  He acknowledged that he heard rumors from more than one person that D & L was going to lose the Powerscreen distributorship.  However, his testimony makes clear that this sort of rumor mill churned continuously.  Salesmen were constantly switching companies, distributorships were changing, and Evans believed that none of the rumors were trustworthy.  He kept returning in his testimony to the fact that he just wanted to be able to get parts.  D & L cannot establish on this testimony that it, in fact, lost any business with Evans due to the purported termination rumor, despite the fact that Evans stated that he was concerned when it became unclear who had what dealerships.

With respect to S & L, Conlon testified that S & L was claiming $700,000.00 for tortious interference "from loss of business from different companies and damages that were done by Terex or Terex's dealers interfering with our business...telling our customers that we have said that we're going to Chapter 11 or our companies are going broke, which is information that we revealed to Terex in our–in our hearing with the Judge that was supposed to be confidential information." Conlon April 9, 2009 depo., p. 45.  He then proceeded to discuss alleged lost sales to Granite Express, Southwest Asphalt, and Achen-Gardner.[17]  The settlement conference in question occurred after the distributorships were terminated.  As the court has determined that it was terminated for failure to make payments under the payment plans, S & L had no entitlement to Powerscreen business after termination of its distributorship.

Conlon also stated that someone from Kimball Equipment informed various customers that its distributorship was being terminated.  April 2009 Conlon depo, p. 46.  Conlon makes no mention of Powerscreen in this regard.

The court finds that no genuine issue of material fact exists with respect to the claims for tortious interference with contracts or prospective business relationships, and that Powerscreen is entitled to summary judgment as a matter of law.

The counterclaims denominated Count V in each action will be dismissed by separate order.

---

[17]In Conlon's February, 2009 deposition, he discusses lost business with Anderson Excavating and Lamb Excavating. However, S & L does not mention this testimony in its response to the summary judgment motion.

G.  Plaintiffs' Motion for Partial Summary Judgment on
Defendant's Counterclaim for Breach of Warranty ('433, DN 98)

and

Plaintiffs' Motion for Partial Summary Judgment on
Defendant's Counterclaim for Breach of Warranty - Count III ('699, DN 75)

The defendants have counterclaimed for setoff for breaches of warranty.  These motions will be denied in part, as entitlement to summary judgment has not been clearly established.

Essentially, the defendants allege that they made warranty claims for repairs they made to machines that they either sold or rented to customers for which they were not paid or for which they did not receive credit.  This appears to have been a somewhat loose process whereby damaged or malfunctioning equipment was repaired by either D & L or S & L, and claims were submitted for reimbursement under a process which has not been clearly explained by any party thus far.  (*See,* Exhibit A to D & L's Response, '433, DN 118).

Powerscreen notes that the approximately 260 applications for warranty reimbursement were submitted to Powerscreen International Distribution, Ltd. ("Powerscreen, Int'l."), rather than Powerscreen.  Powerscreen thus urges that the warranty claims are brought against the wrong party.  In response, D & L notes that in the terms of the warranty procedure documents it states that

> North American dealers ("Dealers") generally contract for their Terex Pegson plants with Powerscreen USA LLC d/b/a Terex Crushing and Screening ("TCS") as opposed to Terex Pegson.  However, to streamline the warranty process, Terex Pegson will administer the warranty procedure as TCS's agent, with the Dealers direct.

D & L contends that Powerscreen Int'l is a wholly owned subsidiary of Terex, and therefore the claims were submitted properly.  The present record is insufficient concerning the entire warranty submission process.

While Powerscreen does not concede the point, it appears from the April 4, 1991 Distributorship Agreement purportedly between Powerscreen of America, Inc., a Kentucky corporation, and Powerscreen Michigan, Inc., a distributor, Powerscreen of America "is the wholly-

- 23 -

owned subsidiary of Powerscreen International Distribution, Ltd., a British Corporation, which has its principal place of business in Dungannon, Northern Ireland and which manufactures screening and materials handling equipment.  Powerscreen International has granted Powerscreen the right to sell and distribute in the United States equipment manufactured by Powerscreen International." Recitals, A.  Powerscreen successfully challenged D & L's use of this document on the ground of relevance to D & L's distributorship rights in Michigan.  Further, the copy of the document submitted was incomplete.  However, we refer to the recital here to indicate that there has been nothing shown to clearly indicate the relationship, if any, among the various Powerscreen and Terex entities.

The technicalities concerning the submission of warranty claims may not prove to be problematic in any event, as the parties apparently periodically engaged in a form of mediation and compromise to resolve these claims in bulk.  *See,* June 1, 2004 letter from Tony Dardis to David Conlon ('433, DN 118, Ex. C).  It is unclear which warranty claims were resolved and/or paid via this procedure, or when these compromises were reached.

Powerscreen contends that various warranty claims date back to 1999 and 2000.  Pursuant to the statute of limitations under the UCC, these claims would have become barred in 2004.  We agree.  There are apparently ten machines for which claims remain viable.  Summary judgment will be denied as to the warranty claims for these machines until the matter is more clearly developed.[18]

The court finds that no genuine issue of material fact exists with respect to warranty claims made in 1999 and 2000, and that Powerscreen is entitled to summary judgment as to those claims. In all other respects, the motion for summary judgment on the defendants' counterclaim for breach of warranty (Count III in each action) will be denied.  A separate order will be entered to this effect.

---

[18]We note that it is unclear whether these claims are for D & L's or S & L's machines, as the claims appear to have been commingled.

- 24 -

**IT IS SO ORDERED.**

September 29, 2009

Charles R. Simpson III, Judge
United States District Court